## MATCEK v. OPPENHEIMER et al.*
### (No. 814–4844.)

Commission of Appeals of Texas, Section B. Oct. 5, 1927.

Brokers ⊚➞55(1)—Broker introducing purchaser to owner held entitled to commission, although owner consummated sale through another broker.

Where real estate broker procured prospective purchaser for land, and, on introducing him to owner, was told by latter that he would conduct further negotiations, *held* that broker was entitled to commission, though he did nothing further, and sale was not consummated until two months later; final negotiations being conducted by second broker.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Action by J. B. Matcek against Jesse D. Oppenheimer and others. Judgment for plaintiff was reversed and judgment rendered for defendants by the Court of Civil Appeals (291 S. W. 1109), and plaintiff brings error. Judgment of the Court of Civil Appeals reversed, and judgment of the district court affirmed.

Thomson, Dilworth & Marshall, of San Antonio, for plaintiff in error.

Gaines, Quin, Harley & Gaines and Vander Hoeven & Greathouse, all of San Antonio, for defendants in error.

POWELL, P. J. The nature and result of this case are correctly and clearly stated by the Court of Civil Appeals as follows:

"Jesse D. Oppenheimer and associates own various lands in Atascosa and other nearby counties, which they desired to sell. J. F. Chupick is engaged in the business of buying lands in that region and colonizing them by selling in small tracts to others. J. B. Matcek is engaged in the real estate and live stock business. All the parties reside and have their offices in San Antonio.

"About the 1st of July, 1924, Oppenheimer and his associates sold a tract of their Atascosa county land, known as the 'Wallis tract,' to Chupick, for a consideration of $26,880. After the sale, Matcek brought this suit against Oppenheimer and his associates for 5 per cent. of the purchase price, which he claimed as his broker's commission upon the sale. Upon the trial of the suit the jury found, in response to special issues submitted to them, that Oppenheimer agreed with Matcek that, if the latter 'would procure a purchaser for the Wallis tract at a price and upon terms acceptable' to Oppenheimer and his associates, he 'would receive a commission of 5 per cent. on the selling price of said property,' and that Matcek did 'procure a purchaser for the Wallis tract of land at a price and upon terms acceptable' to the owners. From a judgment rendered in response to this verdict, Oppenheimer and his associates have appealed.

"We will state the case in the light most favorable to appellee, adopting as true all of his testimony, whether disputed or not, and giving effect only to such other evidence as appears undisputed in the record.

"About the middle of April, 1924, appellee, being acquainted with appellant Oppenheimer, called on the latter and requested him to list his lands with appellee, which was done. Later on appellee learned that Chupick was in the market for lands near Jourdanton for colonization purposes, and with that information in mind again called on Oppenheimer, who told him he had several tracts of land near Jourdanton for sale, and considered it good for colonization purposes. Appellee then mentioned Chupick as a 'prospect', and Oppenheimer said, 'Go ahead: bring him in the office; no matter what we sell him, you will get your 5 per cent.; I will take care of you.' Pursuing the matter, appellee brought Chupick to Oppenheimer's office and introduced them to each other, as they had not theretofore met, and Oppenheimer 'put up to Mr. Chupick several tracts of land which he had previously listed with' appellee, and which were situated in Atascosa and Frio counties, including, it is inferred, the Wallis tract subsequently sold to Chupick. Several different tracts appealed to the latter, who said he 'would look them over later; that he was very busy then, and did not know just when he would have time to look them over'; that the Wallis tract appealed to him; that he would let Oppenheimer know later when he got ready. At this juncture in the negotiations, as stated in appellee's brief: 'Defendant Oppenheimer then informed the plaintiff that he would have a man show Mr. Chupick the land when Mr. Chupick got ready, and that he would take care of the plaintiff all right, and that whatever he sold Mr. Chupick, plaintiff would receive a 5 per cent. commission on the sale. Plaintiff further testified that upon the defendant Oppenheimer informing him that he (Oppenheimer) would take care of the matter of showing the land, and would take care of his commission if Mr. Chupick bought any of Oppenheimer's land, the plaintiff then left.' Quoting further from appellee's brief: 'The plaintiff further testified that when he brought Mr. Chupick in to see Mr. Oppenheimer, they (Chupick and Oppenheimer) had never met before, and that he presented them to each other as strangers, one to the other. The plaintiff further testified, on redirect examination, that, at the time Mr. Oppenheimer told him about the land in question and offered to pay plaintiff a 5 per cent. commission, he (Oppenheimer) just told the plaintiff to bring a buyer in there and he (Oppenheimer) would sell him. "Whatever he would sell him, he would pay me my commission on." * * * "He did not tell me at any particular price, he just said, 'Whatever I sell him, I will take care of you; you will get your 5 per cent. commission.' * * * Then, after I brought Mr. Chupick in and looked at the map and descriptions of the land in Mr. Oppenheimer's office, Mr. Oppenheimer again told me that he would take care of me, and he said, 'Go ahead; I will take care of you; I will have a man show him the land when he gets ready to see it.' * * * That was after I had already brought Mr. Chupick over there." '

"This meeting ended appellee's connection with the negotiations between Oppenheimer and

⊚➞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Rehearing denied November 30, 1927.

Chupick. He did not again mention the matter to either of them.

"After the foregoing conversations, appellee left Oppenheimer and Chupick, who continued their negotiations in appellee's absence, but these further negotiations amounted to no more than Oppenheimer fixing a price of $25 an acre upon the land, which Chupick considered as too high, and left the office. Chupick testified, 'They wanted $25 an acre, and I knew I would not pay that, and I dismissed the idea of buying it and did not do anything further about it. * * * I did not consider the land any further because they wanted $25 an acre.' And although appellee was in Chupick's office two or three times after this meeting with Oppenheimer, he did not again mention the project to Chupick, nor to any one else, until after the land was sold two months later.

"About a month later Chupick was in Pleasanton and asked his friend, President Smith of the First National Bank, about buying lands in the vicinity of Pleasanton. Smith told him of the Wallis ranch, but Chupick demurred to considering that tract, testifying: 'I told Smith I knew I could not buy it, that I could not trade with the Oppenheimers, and he said "I will go down there and talk with them."' It appears that Smith then went to San Antonio and discussed the matter with Oppenheimer, urging him to cut the price of the Wallis land to Chupick, who would colonize the land and help settle the county and thereby benefit the whole country. Smith desired no commission; his interest being that of the public good. He returned to Pleasanton, got in touch with Chupick, and showed him over the Wallis land, which he had not theretofore seen. Smith told him at this time that he could purchase the land from Oppenheimer at less than $25 an acre, and Chupick went to San Antonio and called on Oppenheimer, who told him that if Smith did not claim a commission he would sell the land to Chupick for $22.50 an acre. 'I told him,' Chupick testified, 'I did not feel justified in paying that, and so the deal was off as far as Smith was concerned. I told them I would not buy it at the price;' and the negotiations ended.

"Chupick thought no more of the matter until some weeks later when he was approached by a real estate agent named Hill, who 'told me he heard I wanted to buy some land, and asked me what about this Oppenheimer land. I told him they want too much money for it. I would not pay $22.50 an acre. He said, "What will you pay?" I told him "Well, I have offered him $20, and if he would take $21 I might consider it." Two days later he came back with an option from Mr. Oppenheimer, in which he agreed to take $21 an acre for the land, and pay him 50 cents an acre commission, and while Mr. Hill was in the office Mr. Oppenheimer rang for me to come to his bank, that he wanted to see me. As to what date it was that I had negotiations with Mr. Hill, I will state that it was about two or three days before we closed the contract. I think that was about the middle of June, 1924. Mr. Oppenheimer called me to the bank, and, when I got to the bank, Mr. Oppenheimer showed me a carbon copy of the option he had given Mr. Hill. That option called for $21 an acre net to him, and 50 cents an acre commission to Mr. Hill, the agent. Mr. Oppenheimer then told me, "If you want to buy this land, I will sell it to you at $21 an acre." I told him, "Mr. Oppenheimer, Hill has been trying to buy this land for us." He said, "If that is the case, I will have to pay the commission anyway." I said, "If you will do this, I will buy it direct from you and pay Hill 50 cents an acre, and it will simplify matters if you handle it in that way." And that is the way we made the trade, and I agreed I would pay Hill the 50 cents an acre commission. * * * The terms of that agreement were complied with, and I afterwards purchased the land at $21 an acre, and paid 50 cents an acre commission to Mr. Hill. That commission amounted to six hundred forty and some odd dollars. I had no negotiations at all with Mr. Matcek after he first took me over there, and the proposed trade between me and them at that time was never carried out. I knew at the time I was in the office with Mr. Matcek and Mr. Oppenheimer that we could not trade with him, and so we just left there, and there was nothing more said about it. I took up Mr. Hill's option and paid the purchase price for the land, which was $21 an acre to Mr. Oppenheimer and 50 cents an acre to Mr. Hill.'"

Upon appeal, the Court of Civil Appeals reversed the judgment of the trial court and rendered judgment for the defendants in error Oppenheimer et al. The court said:

"We hold as a matter of law under the foregoing facts that appellee [Matcek] was not entitled to a commission on the sale."

See 291 S. W. 1109.

The sole question presented in this case is whether or not, under the facts as found in both of the lower courts, Matcek is entitled to his commission under the law. Briefly stated, that is the substance of the first and second assignments of error in the application. Counsel for the plaintiff in error submit three propositions under said assignments, as follows:

#### "First Proposition.

"Where the evidence showed that the owner of land listed his land with a broker and promised to pay a commission of 5 per cent. on the selling price, if the broker procured a purchaser for such land, at a price acceptable to the owner, and in pursuance of such agreement, the broker brought to and introduced to the owner a prospective purchaser, and thereupon, the owner of the land advised the broker that he (the owner) would show the land to the prospective purchaser and conduct the negotiations for its sale, and would pay such broker a commission of 5 per cent. on any land he purchased, and thereafter did in fact sell the land to such purchaser, the evidence is sufficient in law to support a verdict of the jury that such broker had procured a purchaser at a price and upon terms acceptable to the owner, and is sufficient to support a judgment in favor of the broker for a commission.

#### "Second Proposition.

"Where an owner of land employed an agent to procure a purchaser for his land at a price and upon terms acceptable to the owner, and,

.upon the agent's bringing to him and introducing a prospective purchaser, he informed the agent that he would himself show the land and conduct the negotiations for its sale, and take care of the commission on anything he sold such purchaser, and later did sell the land to such prospective purchaser, the agent has earned his commission, and his right to compensation is not affected by the fact that the final negotiations were conducted by a second broker, who was employed by the purchaser.

"Third Proposition.

"Where the undisputed evidence showed that an owner employed a broker to procure a purchaser for his land at a price and upon terms acceptable to the owner, and later told the broker to bring in his prospect, and that he (the owner) would conduct the negotiations, and if he sold such prospect anything, would pay the broker his commission of 5 per cent., and upon being introduced to the prospect by the broker first priced his land to the prospect at $25 an acre, which price the prospect refused to pay, and then about one month later offered his land to the prospect at $22.50 an acre, which price the prospect also refused to pay, and then a few weeks later, through a second broker employed by the purchaser, offered his land to the prospect procured by the first broker at $21.50, an acre, which offer was accepted by the prospect, such evidence is sufficient to support a finding by the jury that the first broker procured the purchaser, and the holding by the Court of Civil Appeals, under such facts, that the second broker was, as a matter of law, the procuring cause of the sale, is error, and should not be sustained."

We think these propositions must be sustained. Matcek clearly earned his commission. He did exactly what Oppenheimer told him to do. He co-operated with the owner of the land in making the sale until the latter told him to go ahead and let him (the owner) conduct the negotiations with the prospective purchaser. It is not necessary for us to determine what would have been the duty of Matcek had Oppenheimer later told him to go ahead and try to get the prospect to make the purchase. Had that later instruction been given, countermanding the prior instructions, Matcek would probably have been under the duty of taking additional steps to interest Chupick in making the purchase. But, under the undisputed facts in this record, Oppenheimer did not limit Matcek's period of inactivity. We think the latter, in any event, had a perfect right to obey instructions until Oppenheimer notified him to the contrary. We do not intend to say that Oppenheimer could have been held liable for this commission for years and years in the future. But certainly it could not be said that it was unreasonable for Matcek to wait slightly more than sixty days for additional instructions.

Under the well-settled law of this state, as applied to the peculiar facts of this case, we think Matcek unquestionably entitled to his commission. Section A of the Commission of Appeals discusses the law upon this phase of the case very thoroughly and capably in the case of Keener v. Cleveland, 250 S. W. 151. We quote from that opinion as follows:

"In Ruling Case Law, book 4, p. 320, we find the following: 'The general rule deducible from the decisions upon the question would seem to be that, if there is nothing peculiar in the contract of employment, it is not necessary that the broker should negotiate the sale, when he has found, or procured, or if he has introduced, or given the name of, a purchaser who is able, ready, and willing to purchase the property upon the terms named by the principal and the principal has entered into negotiations with such purchaser, and concluded a sale with him; and in such cases the broker has performed his contract and is entitled to his commissions.'"

We do not take any issue with the rule announced in the decisions cited by the Court of Civil Appeals herein. We think that rule correct. Such rule is quoted by Chief Justice McClendon in the case of Walker v. Van Valkenberg (Tex. Civ. App.) 291 S. W. 936, as follows:

"'Where property is placed for sale with two or more real estate brokers, the owner, provided he remains neutral towards the several brokers, is liable for commissions only to the one who first completes a sale, or, if the owner has not delegated authority to conclude the transaction, to the one who first produces a customer able, ready, and willing to purchase the property on terms agreeable to the owner.' Ann. Cas. 1916B, p. 978, note."

It cannot be said that Oppenheimer remained neutral toward the brokers in this case. The Court of Civil Appeals says that, where several brokers are in the race, it should be to the vigilant. That is true. But, it is also true that each broker should have an equal chance. In this case, Matcek had no such chance. He was the first to introduce Chupick to Oppenheimer. And his further efforts were forestalled by instructions from Oppenheimer. Matcek had a right to rely upon those instructions and obey them and later claim his commission whenever Oppenheimer closed a satisfactory deal with Chupick. Matcek testifies that he made no further efforts to sell the land to Chupick because he had instructions to the contrary from Oppenheimer. We do not believe, under facts like those in the case at bar, there is any sufficient reason in law or equity for denying to Matcek the commission he recovered in the district court.

For the reasons indicated, we recommend that the judgment of the Court of Civil Appeals be reversed and that of the district court affirmed.

CURETON, C. J. Judgment of the Court of Civil Appeals reversed, and that of the district court affirmed, as recommended by the Commission of Appeals.